NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| STACEY C., | |
| Plaintiff, | |
| v. | Civil Action No. 24-8187 (RK) |
| COMMISSIONER OF SOCIAL SECURITY, | **OPINION** |
| Defendant. | |

**KIRSCH, District Judge**

**THIS MATTER** comes before the Court on Stacey C's[1] ("Stacey" or "Plaintiff") appeal from the Commissioner of the Social Security Administration's (the "Commissioner") final decision, which denied Stacey's request for a period of disability insurance benefits and Social Security Insurance (SSI) benefits. (ECF No. 1.) The Court has jurisdiction to review this appeal under 42 U.S.C. § 405(g) and reaches its decision without oral argument under Local Civil Rule 78.1. For the reasons set forth below, the Court **AFFIRMS** the Commissioner's decision.

I.     **BACKGROUND**

In this appeal, the Court must answer the following question: Does substantial evidence support Administrative Law Judge Leonard Costa's ("Judge Costa" or the "ALJ") determination that Stacey was not disabled?

A.     **PROCEDURAL POSTURE**

In June 2019, Stacey filed an application for a period of disability insurance benefits, alleging an onset date of June 1, 2018. (Administrative Record ("AR") at 291–97.)[2] At the time of

---

[1] The Court identifies Plaintiff by first name and last initial only. *See* D.N.J. Standing Order 2021-10.

[2] The Administrative Record ("Record" or "AR") is available at ECF Nos. 4-1 through 4-7. This Opinion will reference

the alleged onset date, Stacey was 32 years old. (*Id.* at 26.) The Social Security Administration (the "SSA") denied her request for benefits both initially (*id.* at 119–20), and on reconsideration (*id.* at 146–48). Thereafter, Stacey requested a hearing before an Administrative Law Judge. (*See id.* at 189–90.) On August 30, 2021, Judge Costa, as the ALJ assigned, held a hearing where he received testimony from both Stacey, represented by counsel, and Elaine Cogliano, a vocational expert. (*Id.* at 64–103.) On September 8, 2021, Judge Costa issued a written decision finding that Stacey was not disabled. (*Id.* at 150–66.)

Stacey requested review of the decision by the SSA's Appeals Council, and, on October 11, 2022, the case was remanded. (*Id.* at 167–70.) A second hearing took place on August 10, 2023, and Judge Costa again heard testimony from Plaintiff and a different vocational expert, Rocco Leola ("VE"). (*Id.* at 34–63.) A month later, on September 15, 2023, Judge Costa again determined that Stacey was not disabled. (*Id.* at 11–33.) Following the same process, Plaintiff again sought review by the Appeals Council, but this time, they denied Plaintiff's request, finding "no reason under [Social Security] rules to review the Administrative Law Judge's decision." (*Id.* at 1–10.) This appeal followed. (ECF No. 1.) The Record was filed on the docket on September 29, 2024. (ECF No. 4.) After four separate 45-day extensions, Stacey filed her moving brief ("Pl. Br.," ECF No. 13) on June 6, 2025, the Commissioner filed an opposition brief (ECF No. 17) on July 15, 2025. No reply brief was filed.[3]

---

only page numbers in the Record without the corresponding ECF numbers.

[3] Under the rules governing Social Security appeals, a "plaintiff may file a reply brief and serve it on the Commissioner within 14 days after service of the Commissioner's brief." Fed. R. Civ. P. Supp. R. (8). The reply brief was due on July 29, 2025. No reply brief was filed nor was an extension sought.

## B.    JUDGE COSTA'S DECISION

On September 15, 2023[4], ALJ Costa issued a thorough well-reasoned 15-paged, single-spaced decision finding Plaintiff Stacey not disabled from June 1, 2018 through September 15, 2023. (*See generally* AR at 14–28.)

Plaintiff Stacey, now aged 39, was born on April 10, 1986, making her 32 on the alleged disability onset date. (*Id.* at 26.) At the time of the August 2023 hearing, she lived in a multi-story home with her boyfriend and three children, aged 2, 11, and 14. (*See id.* at 20, 27.) She possessed a driver's license, drove a vehicle, was able to read, socialized with friends on the phone, shopped in stores on a weekly basis, and managed her finances, including handling her bills, checkbook, and savings account. (*See id.* at 19–21, 382.)

Stacey provided self-serving testimony indicating she was in special education classes (*see id.* at 24–25, 72), but she affirmatively stated otherwise in her Disability Report (Form SSA-3368) (*see id.* at 361). Stacey was previously employed as a daycare teacher from January 2003 through October 2014, a retail clerk from June 2005 through April 2007, and a child monitor from September 2016 until June 2018. (*Id.* at 26, 69, 73, 133).

Stacey alleges she suffers from three different types of ailments: (1) musculoskeletal; (2) neurological; and (3) psychiatric. In reaching his September 15, 2023 decision, Judge Costa analyzed Stacey's application under the five-step process for determining whether an individual is disabled as set forth in 20 C.F.R. § 404.1520(a). At Step One, Judge Costa found that Stacey had not engaged in substantial gainful activity since the alleged onset date of June 1, 2018. (*Id.* at 17

---

[4] This appeal concerns only Judge Costa's September 15, 2023 decision, not his September 8, 2021 decision, which was remanded by the Appeals Council. (*See* AR at 167.) Therefore, the Court need only review the September 15, 2023 decision herein.

(citing 20 C.F.R. §§ 404.1571 *et seq.* and 416.971 *et seq.*).) At Step Two, the ALJ found that Stacey suffered from the following severe ailments: migraine headaches, seizure disorder, lumbar disc herniation, post-traumatic stress disorder ("PTSD"), depressive disorder, attention deficit disorder ("ADD"), and generalized anxiety disorder. (*Id.* (citing 20 C.F.R. §§ 404.1520(c) and 416.920(c)).) Also at Step Two, Judge Costa considered Plaintiff's obesity singularly and in conjunction with those other medical impairments. (*Id.*) At 5'2" and 188 pounds, Stacey had a BMI of 34.39, putting her in the "obesity" category. (*Id.* (citing SSR 19-2p).) The ALJ concluded that her obesity would not cause any significant work-related limitations of functions and was therefore a "nonsevere" impairment. (*Id.*)

At Step Three, Judge Costa determined that Stacey did not have an "impairment or combination of impairments" that qualified under the SSA's listed impairments. (*Id.* at 20 (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).) He concluded that no "acceptable medical source" opinion found that Stacey's conditions were equivalent in severity to any listed impairment. (*Id.* at 18.) The ALJ specifically considered musculoskeletal listings for her spine impairments, neurological disorders for her migraine headaches and seizure disorder, and mental disorders for her anxiety, depression, PTSD, and ADD. (*Id.* at 18–20.)

Next, as a precursor to Step Four, Judge Costa concluded that Stacey had the residual functional capacity ("RFC") to perform sedentary work, *see* 20 C.F.R. §§ 404.1567(b) and 16.967(a), but that any job she performed had to be limited in specified ways:

> a cane [is needed] to ambulate for more than 50 feet or on uneven terrain. She can have no exposure to unprotected heights or hazardous machinery. [Stacey] can have occasional contact with supervisors and co-workers but no direct contact with the general public. She cannot work in tandem with co-workers such as on an assembly line. [Plaintiff] is able to understand, remember, and carry out simple instructions with only occasional changes to essential job

functions, is able to make simple work related decisions, and would
be off task approximately 10 percent of the workday.

(AR at 20.)

At Step Four, Judge Costa concluded that Stacey was not capable of performing her past

relevant work as a child monitor. (*Id.* at 26 (citing 20 C.F.R. §§ 404.1565, 416.965).) The ALJ

noted a child monitor required "light exertional work," which exceeded the sedentary work to

which she was limited. (*Id.*)

Finally, at Step Five, Judge Costa heard testimony from the VE and concluded that Plaintiff

"is capable of making a successful adjustment to other work that exists in significant numbers in

the national economy." (*Id.* at 28 (citing 20 C.F.R. §§ 404.1569, 404.1569a, 16.969, and

416.969a).) The impartial VE testified that the representative jobs Stacey could perform, consistent

with Judge Costa's RFC, included document preparer, scale operator, and final assembler. (*Id.* at

27.) Thus, the ALJ concluded that Plaintiff was not under a disability from June 1, 2018 through

the date of decision. (*Id.* at 28 (citing 20 C.F.R. §§ 404.1520(g) and 416.920(g)).)

This appeal primarily concerns Judge Costa's consideration of Stacey's obesity at Steps

Two and Four; his assessment that Stacey did not meet any listings in Step Three; and his RFC

determination as a precursor to Step Four. (*See generally* Pl. Br.) Thus, the Court summarizes in

greater detail the aspects of Judge Costa's decision relating to these issues.

1.    Stacey's Obesity

As part of the Administrative Appeals Council's remand of Judge Costa's first decision,

the Council noted that the ALJ's decision lacked an adequate evaluation of Plaintiff's obesity. (AR

at 169.) The remand order instructed Judge Costa to give consideration as to "whether obesity is

a[] [medically determinable impairment]" in accordance with SSR 19-2p.[5] (*Id.*)

---

[5] SSR 19-2 provides guidance on evaluating obesity in disability claims. Social Security Ruling, SSR 19-2p; Titles II

In the decision currently before the Court on appeal, the ALJ addressed Plaintiff's obesity as part of Step Two and determined that it was not a medically determinable impairment:

> [Plaintiff's] obesity is a nonsevere impairment. [She] was obese according to her height and weight at an April 2019 neurology visit, where it was indicated that she was 5'2 and 188 pounds, corresponding with a body mass index [BMI] of 34.39 [AR at 448]. SSR 19-2p requires consideration of obesity in determining whether a claimant has medically determinable impairments that are severe, whether those impairments meet or equal any listing, and finally in determining the residual functional capacity. Obesity may have an adverse impact upon co-existing impairments. For example, someone with obesity and arthritis may have more pain in weight-bearing joints than might be expected from arthritis alone. In addition, obesity may limit an individual's ability to sustain activity on a regular and continuing basis during an eight-hour workday, five-day week, or equivalent schedule. In this case, there is no indication that the [Plaintiff's] obesity, when evaluated singularly or in combination with her other medical impairments, causes her any significant work-related limitations of function but only a slight abnormality or a combination of abnormalities that have no more than a minimal effect on her ability to work (20 CFR 404.1522 & SSRs 85-28, 16-3p, & 19-2p). As such, the [Plaintiff's] obesity is a nonsevere impairment.

(*Id.* at 17.) As stated, the ALJ explicitly considered whether her obesity had any effect on her ability to work even if it was not specifically mentioned in Steps Three and Four of his analysis. Judge Costa concluded that her obesity did not cause her any significant work-related imitations. (*Id.*)

### 2.    Matching with a Listing

The ALJ determined that Plaintiff's spine impairments did not qualify under listings 1.15 for "[d]isorders of the skeletal spine resulting in compromise of a nerve root" or 1.16 for "[l]umbar spinal stenosis resulting in compromise of the cauda equina." (*Id.* at 18.) Judge Costa noted that the record evidenced no prescription for or any longitudinal use of an ambulatory assistive device

---

and XVI: Evaluating Cases Involving Obesity, 84 FR 22924-01.

sufficient to meet either of these two listings. (*See id.* at 18, 23.) Further, he found the record did not show Stacey had an inability to use both of her upper extremities. (*Id.* at 18.)

Just the same, Judge Costa concluded that Plaintiff's migraine headaches did not meet any listing under section 11.00, nor did her claimed neurological conditions—headaches and seizures— qualify under listing 11.02's criteria for epilepsy. (*Id.*)

Lastly, the ALJ considered whether the mental impairments inflicting Plaintiff qualified— singularly or in combination—for listings 12.04 for depressive, bipolar, and related disorders; 12.06 for anxiety and obsessive-compulsive disorders; 12.11 for neurodevelopmental disorders; or 12.15 for trauma- and stressor-related disorders. (*Id.*)

From the record, the ALJ observed that Stacey had only a moderate limitation in each of the four "Paragraph B" criteria for mental disorder listings (12.00)[6]: (a) understanding, remembering, or applying information; (b) interacting with others; (c) concentrating, persisting, or maintaining pace; and (d) adapting or managing oneself. (*Id.* at 19.) For all of these, Judge Costa acknowledged Stacey's results were mixed and he recognized some difficulties and some abilities in each category.

With respect to the first and third categories, while acknowledging deficits in memory, attention, concentration, and following instructions, the ALJ, nevertheless, recognized Plaintiff's ability to drive a car, manage her finances, and read. Judge Costa, thereby, found Stacey to be moderately limited in the first and third categories. (*Id.*)

On interacting with others, the ALJ noted that although Plaintiff's had an alleged aversion to large crowds and difficulty in getting along with others, she frequently socialized with friends

---

[6] As discussed *infra* § III.B.3, to qualify for one of the four mental disorders, Plaintiff must satisfy the applicable "Paragraph A" criteria for each listing and either "Paragraph B" or "Paragraph C" criteria. For listing 12.11, Paragraph B must be satisfied as there is no applicable Paragraph C for that listing.

on the phone and shopped in stores. (*Id.*) The ALJ found these divergent facts led to a moderate limitation in the second domain.

For the fourth and final area of mental functioning, the ALJ noted Plaintiff's conservative outpatient mental health treatment; no marked findings in her longitudinal mental status examinations; fair grooming, insight, and judgment; and adequate hygiene. (*Id.*) These factors stand in contrast to Plaintiff's claimed difficulties in dealing with stress and changes in her routine, and panic attacks when going out of her home. Here too, the ALJ concluded that Stacey had a moderate limitation.

Judge Costa also considered whether Plaintiff's conditions could qualify as a serious and persistent mental disorder under Paragraph C. (*Id.* at 19–20); 20 C.F.R. pt. 404 Subpt. P, app. 1 § 12.00(A). In concluding Stacey had no such disorder, the ALJ found the record to be devoid of "psychiatric emergency department visits, partial hospitalizations, inpatient hospitalizations, []or any significant mental exacerbations since the alleged onset date." (*Id.* at 19.)

### 3.    Stacey's Residual Functional Capacity

Judge Costa determined Stacey's RFC "[a]fter careful consideration of the entire record." (AR at 20.) This included a review of (i) Stacey's own reported symptoms; (ii) the objective medical evidence; and (iii) medical opinions and prior administrative medical findings. (*Id.*)

#### a)    Stacey's Reported Symptoms

The ALJ began by considering Stacey's reported symptoms. (*Id.* at 23.) As he summarized, Stacey lived in a multi-story dwelling and used the stairs, with some difficulty, to access the basement laundry room. (*Id.* at 20.) She possessed a driver's license but claimed to drive on a limited basis due to her anxiety. (*Id.* at 20–21.) She had migraine headaches causing nausea that could last a few hours with a self-reported pain level of "10 out of 10." (*Id.* at 21.) She testified to

experiencing three to four "grand mal" or "tonic-clonic" seizures per month.[7] These episodes purportedly caused her to lose consciousness and become drowsy. In addition, Stacey testified that she experienced smaller seizures almost daily, rendering her unresponsive for three to four minutes at a time. This coincided with her not taking seizure medication because of apparent insurance and availability reasons. She also testified that she experienced hour-long panic attacks when leaving the house. (*Id.*)

For back and neck pain, she saw a chiropractor. (*Id.*) She explained that she experienced heightened pain when walking and moving her neck. (*Id.*) To support her balance, she used a cane "but no longer used a walker; rather, she leaned on the baby's stroller for support." (*Id.*; *see also id.* at 53.)

### b)    Objective Medical Evidence

Judge Costa next considered the available medical evidence relating to Stacey's back and spine ailments. The ALJ noted that in January 2015, three years prior to the alleged onset date, Plaintiff complained of lower back pain. (*Id.* at 21.) Around the same time, Plaintiff was negative for multiple sclerosis but was diagnosed with lumbar disc herniations as revealed in an MRI. (*Id.* at 21, 430.) Physical therapy, epidural injections, and other conservative treatments ensued. (*Id.* at 21.) In April 2018, Plaintiff was observed to be using a cane and three years later, in 2021, at a psychological consultative examination, she was observed to have a "shuffling gait" and to use a walker. (*Id.* (citing *id.* at 458, 520).)

In June 2015, Stacey was prescribed medication in response to her complaints of recurrent

---

[7] According to the Cleveland Clinic, tonic-clonic seizures, also known as grand mal seizures, are caused by abnormal electrical activity in the brain that result in involuntary jerking movements and stiff muscles. These unpredictable seizures can involve passing out and shaking uncontrollably. *See* Cleveland Clinic, http://my.clevelandclinic.org/health/diseases/22788-tonic-clonic-grand-mal-seizure (last visited July 31, 2025).

migraines. (*Id.* (citing *id.* at 428).) Although the medication was initially effective, roughly four years later, in the middle of 2019, Plaintiff reported a significant uptick in migraines. (*Id.* (citing *id.* at 448).) Around this time, Stacey's antidepressant medication dosage was also increased, and she started to complain of attention and memory deficits, racing thoughts, and trouble sleeping. (*Id.*) Later in 2019, Plaintiff's doctors increased her seizure and insomnia medications. (*Id.* at 22 (citing *id.* at 446).) Throughout the next couple of years, her seizure medication was frequently adjusted. (*See, e.g., Id.* (citing *id.* at 559, 560, 562, 566, 567, 568, 569, 572).) In May 2021, Plaintiff was 30 weeks pregnant and reported twice daily "staring spells" and ongoing migraines. (*Id.* (citing *id.* at 568–69).) At the same time, her seizures dissipated in conjunction with her prescribed medication. (*Id.*) In July 2021, she gave birth to a healthy baby girl. (*Id.* (citing *id.* at 560).) Following Stacey's telehealth visit the next month regarding her seizures, she was put on different seizure medication. (*Id.* (citing *id.* at 558–59).) This was her last recorded neurology visit.

At Stacey's April 2018 psychiatric physician assistant appointment, she was characterized as having fair grooming, insight, and judgment; appropriate affect; coherent thought process; no hallucinations; and intact cognition. (*Id.* (citing *id.* at 458).) However, she was noted as having psychomotor agitation and an anxious mood. (*Id.*) In all, Stacey was diagnosed with ADD, generalized anxiety disorder, and panic attacks, and was prescribed antidepressants. (*Id.*) At a May 1, 2019 medication management visit, Plaintiff was prescribed anti-anxiety medication for persistent panic attacks. (*Id.* (citing *id.* at 460).) At the visit, she was observed to have fair grooming, concentration, focus, insight, and judgment; a logical thought process; intact cognition; appropriate affect; and some restlessness. (*Id.*) Two weeks later, at another medication management visit, Plaintiff reported problems focusing and was prescribed ADD medication. (*Id.* (citing *id.* at 462).) At the next month's visit, Plaintiff's dosage of ADD medication was increased

even though her mental status examination findings remained stable. (*Id.* (citing *id.* at 465).)

In June 2018, blood work revealed alcohol but no presence of her prescribed antidepressants indicating that she has not been up to date with her medication. (*Id.* (citing *id.* at 467).) Between the middle of 2018 and late 2020, the dosages of Plaintiff's antidepressant and ADD medication were increased, she was prescribed an antipsychotic drug, and she was diagnosed with PTSD and major depressive disorder. (*Id.* at 23 (citing *id.* at 475, 477, 479, 486).) At the same time, her mental status examination results remained stable until November 2019, when she showed significant improvements including good grooming; normal psychomotor activity; "a euthymic mood"; and good concentration, focus, insight, and judgment. (*Id.* (citing *id.* at 514).)

        *c)*     *Judge Costa's Review of Stacey's Statements as to her Intensity, Persistence, and Limiting Effects of her Symptoms*

Judge Costa characterized Stacey's statements as to her intensity, persistence, and limiting effects of her spinal, neurological, and mental symptoms as inconsistent with the evidence in the record. (*Id.* at 23.) With respect to her spinal ailments, Judge Costa found that the record reflects "very remote spine treatment" in years prior to the onset date. (*Id.* (citing *id.* at 427–37).) Although Stacey was diagnosed with degenerative disc disease, she did not experience more severe conditions such as canal stenosis, neural foraminal narrowing, or nerve root compression. (*Id.*) Plaintiff's treatment was also quite conservative: physical therapy, pain management, and injections. (*Id.*) Stacey did not need any invasive surgery. Additionally, even though the record did not evidence a prescription for an ambulatory assistive device, the ALJ gave Stacey "the benefit of the doubt" and incorporated cane usage into the RFC because her mental health professionals had observed her using one. (*Id.* (citing *id.* at 458, 520).)

According to the ALJ, records of Stacey's neurology treatment reflect that Stacey complained of consistent pain discomfort associated with her migraines but never kept a "detailed

headache diary" or received a positive diagnostic test. (*Id.* (citing *id.* at 438–57, 557–76).) Plaintiff's electroencephalogram (EEG), was abnormal but did not reflect "actual seizure activity." (*Id.* (citing *id.* at 440, 443, 448–49).) Further, the ALJ noted that Plaintiff was not always in compliance with her seizure medication despite her claim of persistent seizures. (*Id.* at 24. (citing *id.* at 557, 567).) Judge Costa also noted large gaps in Stacey's neurology treatment, including up to 20 months between October 2019 and April 2021. (*Id.*)

Judge Costa acknowledged that Stacey regularly reported symptoms to her treating mental health professionals. (*Id.* (citing *id.* at 458–89, 492–517).) Even still, he found that the record reflected nothing more than "conservative treatment" and "no acute exacerbations" requiring more intensive treatment. (*Id.*) Further, there is no record of any mental health treatment after May 2021. (*Id.*)

In all, Judge Costa found Plaintiff's testimony as to the *limiting effects* of her spinal, neurological, and mental conditions to be inconsistent with objective findings and data in the record. (*Id.* at 23–24.)

### d)    *Medical Opinions and Prior Administrative Medical Findings*

Judge Costa next considered six medical opinions and prior administrative medical findings on the record. He found all six of the opinions to be unpersuasive. *First*, the ALJ examined the mental impairments reviewed by Anne Naplin, Ph.D, initially, and Joseph Wieliczko, Psy.D. on reconsideration. (*Id.* at 24 (citing *id.* at 104–19, 122–47, 491).) In contrast to the severe mental impairments that Judge Costa found at Step Two including PTSD, depressive disorder, ADD, and generalized anxiety disorder, Dr. Naplin and Dr. Wieliczko concluded that Plaintiff had *no* severe mental impairments with *no* limitations understanding, remembering or applying information. (*Id.*) They also opined that Stacey had only *mild* limitations in the other three categories: interacting with others; concentrating, persisting or maintaining pace; and adapting or managing oneself. (*Id.*)

Judge Acosta rejected their opinions because they were based on an "incomplete record" and because their opinions were contrary to Plaintiff's ongoing mental health treatment, which involved antidepressant, anti-anxiety, and ADD medication to treat her mental health symptoms. (*Id.*; *see also id.* at 109, 117, 129, 142.)

*Second*, Stacey underwent a mental health examination with Theodore Brown, Ph.D. (*Id.* (citing *id.* at 518–24).) Unlike Dr. Naplin and Dr. Wieliczko, Dr. Brown diagnosed Plaintiff with unspecified neurocognitive and learning disorders, panic/anxiety disorder, and borderline personality disorder. (*Id.* (citing *id.* at 521).) Dr. Brown found a mix of mild, moderate, and marked limitations. (*Id.*) Judge Costa found Dr. Brown's opinion unpersuasive because he evaluated Stacey only once and his assessment of marked limitations was not consistent with her conservative outpatient treatment or her longitudinal mental status examinations. (*Id.*) Moreover, the ALJ refused to adopt the diagnosis of a neurocognitive/learning disorder as he determined it was inconsistent with the longitudinal findings of a generally intact cognition. This diagnosis apparently stemmed from Plaintiff's unsupported self-serving claim of having been enrolled in special education classes (*see id.* at 24–25 (citing *id.* at 521)), which is belied by the representation in her Disability Report that she did not attend such classes (*see id.* at 361.).

*Third*, Judge Costa considered the prior administrative medical findings by James Paolino, M.D. initially, and by Vaghenag Tarpinian, M.D. on reconsideration. (*Id.* at 25 (citing *id.* at 104–19, 22–47).) Dr. Paolino explained that he was presented with "insufficient medical evidence" to evaluate Stacey's condition (*id.* at 108, 116), and accordingly, Judge Costa reasonably found that his opinion was unpersuasive based on the "incomplete record" he reviewed. (*Id.* at 25.) Dr. Tarpinian, on the other hand, opined that Plaintiff could perform light work with frequent postural activities, with some limits and exceptions. (*Id.*) Dr. Tarpinian also recommended that Stacey

13

avoid extreme cold, extreme heat, wetness, and humidity (*Id.*) Judge Costa gave little weight to the opinion of Dr. Tarpinian because there was no evidence in the record showing that Plaintiff's seizures and migraines were caused by any weather conditions. (*Id.*)

*Lastly,* Judge Costa found Kathryn McBratney's, LSW assessment of Plaintiff's cognitive abilities to be unpersuasive. (*Id.*) Dr. McBratney assessed Stacey to have a mix of "fair," "poor/no ability" in various mental aptitude areas, including poor/no ability in "follow[ing] work rules," "deal[ing] with work stress," and "maintain[ing] attention/concentration." (*Id.*; *id.* at 532–33.) The ALJ found these assessments to be inconsistent with the mental health treatment records, which evidence "conservative outpatient treatment," no psychiatric emergency department visits, inpatient hospitalizations, or any "acute exacerbations." (*Id.* at 19, 24–26.) Further, no treatment records by Ms. McBratney were provided or otherwise appeared in the record.

Out of an "abundance of caution" and giving Plaintiff the benefit of the doubt, the ALJ restricted Plaintiff to a sedentary work, based on her subjective allegations of pain and reduced physical functioning, and indicated that she would be off task for 10 percent of the workday. (*Id.* at 25–26.)

## II.    LEGAL STANDARD

### A.    STANDARD OF REVIEW

The Court reviews the "final decision of the Commissioner of Social Security" to determine whether the Commissioner's findings are "supported by substantial evidence." 42 U.S.C. § 405(g). If the Appeals Council denies a claimant's request for review, "the ALJ's decision is the Commissioner's final decision." *Matthews v. Apfel,* 239 F.3d 589, 592 (3d Cir. 2001). Substantial evidence is "more than a mere scintilla but may be somewhat less than a preponderance of the evidence." *Zirnsak v. Colvin*, 777 F.3d 607, 610 (3d Cir. 2014) (quoting *Rutherford v. Barnhart,*

399 F.3d 546, 552 (3d Cir. 2005)). Put differently, "[i]t means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Morales v. Apfel,* 225 F.3d 310, 316 (3d Cir. 2000) (quoting *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999)). This evidentiary threshold "is not high." *Biestek v. Berryhill,* 587 U.S. 97, 103 (2019).

The scope of the Court's review of the ALJ's decision is "quite limited." *Rutherford*, 399 F.3d at 552. On review, the Court may not "re-weigh the evidence or impose [its] own factual determinations." *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 359 (3d Cir. 2011). "Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently." *Fargnoli v. Massanari,* 247 F.3d 34, 38 (3d Cir. 2001). The court, in its appellate function, must "review the record as a whole to determine whether substantial evidence supports a factual finding." *Zirnsak,* 777 F.3d at 610 (citing *Schaudeck v. Comm'r of Soc. Sec. Admin.,* 181 F.3d 429, 431 (3d Cir. 1999)). "Since it is apparent that the ALJ cannot reject evidence for no reason or for the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter v. Harris,* 642 F.2d 700, 706–07 (3d Cir. 1981) (citation omitted).

## B.    ESTABLISHING ELIGIBILITY FOR DISABILITY INSURANCE BENEFITS

A claimant may establish disability under the Social Security Act by proving they are unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The ALJ applies a well-established "five-step sequential evaluation process," which requires considering whether the claimant:

> (1) is engaged in substantial gainful activity; (2) suffers from an impairment or combination of impairments that is "severe"; (3) suffers from an impairment or combination of impairments that meets or equals a listed impairment; (4) is able to perform his or her past relevant work; and (5) is able to perform work existing in significant numbers in the national economy.

*McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004) (citing 20 C.F.R. §§ 404.1520(a)–(f), 416.920(a)–(f)). The claimant bears the burden at the first four steps, at which point it shifts to the Commissioner at Step Five. *Hess v. Comm'r Soc. Sec.*, 931 F.3d 198, 201 (3d Cir. 2019).

## III.    DISCUSSION

Plaintiff makes five distinct arguments before the Court. *First*, the decision failed to properly consider Plaintiff's obesity at Steps Two and Four. (Pl. Br. at 10–13, 50.) *Second*, the ALJ gave insufficient weight to Stacey's use of a walker, thus rendering her ineligible for listings 1.15 and 1.16. (*Id*. at 14–16.) *Third*, the ALJ's Step Three analysis for listings at section 11.00 was deficient. (*Id*. at 17–21.) *Fourth*, the ALJ erred in rating Plaintiff's four limitations (the "Paragraph B" criteria) as moderate so that she would not meet the psychiatric listings.[8] (*Id*. at 21–34.) *Fifth*, five of the RFC's limitations are without support.[9] (*Id*. at 43–48.) The Court addresses each argument in its appropriate analytical steps.

## A.    STEP TWO

Plaintiff first argues that the ALJ's determination at Step Two that Plaintiff's obesity is not "severe" is "a conclusory statement" rather than a finding. (Pl. Br. at 11.) The Court can quickly

---

[8] The four moderate limitations or the "Paragraph B" criteria are: (a) understanding, remembering, and applying information; (b) interacting with others; (c) concentration, persistence, and pace; and (d) adapting/managing in a competitive work environment.

[9] The five findings are that Plaintiff: (a) can perform sedentary work; (b) would be off task "approximately 10% of the workday"; (c) can have "occasional" contact with supervisors and coworkers; (d) requires a cane to travel more than 50 feet or for uneven terrain; and (e); is able to understand, remember, and carry out simple instructions with only occasional changes to essential job function. (Pl. Br. at 43–44; AR at 21.)

dispose of any Step Two arguments because, as here, where an ALJ found that Plaintiff had *at least one* severe impairment, any purported error at this step is harmless. (AR at 17); *see, e.g., McAuliffe v. O'Malley*, No. 23-477, 2024 WL 1329316, at *4 (W.D. Pa. Mar. 27, 2024) ("Because her claim was not denied at Step Two though, it is not relevant whether the ALJ should have also specifically found her obesity to be a severe impairment." (citing *Salles v. Comm'r of Soc. Sec.*, 229 F. App'x 140, 145 n.2 (2007))). "It is well established that any omission of an impairment at Step Two is harmless error, provided that the ALJ determines that the [Plaintiff] has at least one severe impairment and continues onto the subsequent steps of the sequential analysis." *Vanessa T-H. v. Comm'r of Soc. Sec.*, No. 23-2293, 2024 WL 1635685, at *4 (D.N.J. Apr. 16, 2024) (citing *Salles*, 229 F. App'x at 145 n.2). Although Judge Costa ultimately concluded that Plaintiff's obesity was not a severe impairment, the ALJ did find that Plaintiff suffered from a series of other severe impairments and continued to Step Three. (AR at 17.) Plaintiff has not met her burden here.[10]

**B.    STEP THREE**

Plaintiff next argues that she should have qualified for listed impairments under three different categories: (i) musculoskeletal disorders (listings 1.15 and 1.16); (ii) neurological disorders (listing 11.02); and psychiatric disorders (listing 12.04, 12.06, 12.11, and 12.15).

"At step three, an ALJ is charged with determining whether a [plaintiff's] impairment or combination of impairments meets, or medically equals, the criteria of an impairment listed in 20

---

[10] To be sure, the Court does not find that Stacey met her burden to show that the ALJ erred in its analysis at Step Two (even if any possible error would necessarily be harmless). *See Araujo v. Comm'r of Soc. Sec.*, No. 08-5655, 2009 WL 2928910, at *5 (D.N.J. Sept. 9, 2009) (indicating a plaintiff fails to meet her burden at Step Two where she "has not presented any evidence demonstrating that [her] obesity 'significantly limits [her] physical or mental capacity to perform basic work activities'" (quoting 20 C.F.R. § 416.920(c)) (citing *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987))). After all, the ALJ acknowledged Stacey's obesity impairment at Step Two and proceeded to evaluate whether it on its own or in conjunction with her other medical impairments, causes her any significant work-related limitations. (*See* AR at 17.)

C.F.R. §§ 404.1520(d) and 416.920(d)." *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 502 (3d Cir. 2009). While the ALJ must provide "*some* discussion of this determination," neither particular language or a particular analytical format is required. *Holloman v. Comm'r Soc. Sec.*, 639 F. App'x 810, 813–14 (3d Cir. 2016) (first citing *Diaz*, 577 F.3d at 504–05; then citing *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004)) (emphasis added).

Importantly, "the effects of all medically determinable impairments, regardless of severity," must be considered. *Rodriguez v. Berryhill*, No. 17-6884, 2019 WL 1013343, at *9 (D.N.J. Mar. 1, 2019) (citing *Kerdman v. Colvin*, No. 13-04216, 2014 WL 3783872, at *8 (D.N.J. July 30, 2014)). To succeed on appeal at Step Three, Plaintiff must show that the ALJ made an error, *and* that error caused her not to prevail. *See Erazo v. O'Malley*, No. 22-820, 2024 WL 1704905, at *6 (E.D. Pa. Apr. 18, 2024) (citing *Holloman*, 639 F. App'x. at 814). In other words, Plaintiff has the burden to present sufficient evidence that her medical ailments were commensurate with a listed impairment. *See Williams v. Comm'r of Soc. Sec.*, 156 F. App'x 501, 505 (3d Cir. 2005) (referring to the "exacting standard" of the plaintiff's step three burden); *see also Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 120 n.2 (3d Cir. 2000) ("[T]he burden is on the [Plaintiff] to present medical findings that show his or her impairment matches a listing or is equal in severity to a listed impairment.").

    1.    <u>Musculoskeletal Listings</u>

Plaintiff describes the ALJ's analysis that she did not meet the requirements for spinal disorders under listings 1.15 and 1.16 as "vague and convenient." (Pl. Br. at 11–16.) To satisfy listing 1.15 or 1.16, an individual must have "medical documentation" of:

> of any of the following lasting or expecting to last for a continuous period of at least 12 months: 1) a documented medical need for a walker, bilateral canes, or bilateral crutches, or a wheeled and seated mobility device involving the use of both hands; or 2) an inability to use *one* upper extremity to independently initiate, sustain, and

> complete work-related activities involving fine and gross
> movements, *and* a documented medical need for a one-handed,
> hand-held assistive device that requires the use of the other upper
> extremity or a wheeled and seated mobility device involving the use
> of one hand; or 3) an inability to use *both* upper extremities to the
> extent that neither can be used to independently initiate, sustain, and
> complete work-related activities involving fine and gross
> movements.

(AR at 18); *e.g.,* 20 C.F.R. pt. 404 Subpt. P, app. 1 § 1.15(D). In concluding that Plaintiff did not

meet listing 1.15 or 1.16, the ALJ found "[t]he record does not reflect a prescription for nor

longitudinal use of an ambulatory assistive device using both hands and did not show an inability

to use both upper extremities." (AR at 18.)

Plaintiff contends that the ALJ erroneously omitted any discussion as to why her obesity

does not affect her other impairments, particularly her spinal conditions. (Pl. Br. at 11.) Stacey

posits that it is self-evident that spinal disorders would be "adversely affected" by her obesity. (*Id.*

at 12.)

The ALJ did recognize that obesity *may* have an adverse impact on other impairments. (AR

at 17.) In this case, however, the ALJ concluded that there is nothing in the record supporting an

inference that Plaintiff's obesity, on its own or in conjunction with other impairments, "causes her

any significant work-related limitations of function." (*Id.*) In other words, her obesity has "no more

than a minimal effect on her ability to work." (*Id.*); *see Leonardis v. Comm'r of Soc. Sec.*, No. 18-

13098, 2020 WL 6281606, at *3 (D.N.J. Oct. 27, 2020) ("ALJ's statement that he considered the

combination is sufficient under Third Circuit law.").

Importantly, "adversely affected" is not the standard that Plaintiff must meet, rather

Plaintiff must show that her impairments on their own or in combination meet the criteria of a

listing. Even if it is common sense and recognized that "[t]he combined effects of obesity with a

musculoskeletal disorder can be greater than the effects of each of the impairments considered

separately," obesity does not *automatically* necessitate a finding that a plaintiff meets a listing under Step Three. *See* 20 C.F.R. pt. 404, Subpt. P, app. 1 § 1.00. Plaintiff points to no record evidence showing that her obesity causes her to meet the requirements of listings 1.15 or 1.16.

Even without considering her obesity, Plaintiff contends that she should have met the criteria under listings 1.15 and 1.16 because she used a walker and is "reported to shuffle." (Pl. Br. at 13–16.) As mentioned *supra*, an individual can meet the criteria under listing 1.15 or 1.16, if she has a documented medical need for a walker lasting or expected to last for a more than a year. (AR at 18.) The ALJ determined that Plaintiff did not meet the criteria because there was no record of any (a) prescription for a walker or other ambulatory assistive device using both hands; (b) longitudinal use of an ambulatory assistive device using both hands; (c) or an inability to use both upper extremities. (*See id.*)

Plaintiff argues that her testimony at a hearing in August 2023 belies that conclusion. (*Id.*) In that hearing, Stacey explained that although she no longer used a walker, she *claims* to have been previously prescribed a walker, which she used for a year. (*Id.* at 52–53; *accord id.* 81–82.) This testimony stands in contrast to what she said at a hearing two years earlier, in which she explained that her primary care physician prescribed the cane, but that they just "talked" about a walker. (*Id.* at 82–83.) Yet, in response to the ALJ's inquiry at the August 2021 hearing, Plaintiff's counsel confirmed that there have been no records from her primary care physician, including no prescription for a walker or cane. (*Id.* at 83.) Indeed, there is no evidence in the record—outside of Plaintiff's own self-serving testimony—that she was ever prescribed use of a walker or cane by a medical professional. *See Lauren R. v. Kijakazi*, No. 20-15611, 2023 WL 3884120, at *11 (D.N.J. June 8, 2023) ("A claimant's testimony that a cane has been prescribed is not enough to meet this burden." (citing *Mundo v. Kijakazi*, No. 21-517, 2023 WL 2632810, at *5 (M.D. Pa. Mar. 24,

2023))).[11] Listings 1.15 and 1.16 require a "documentation medical need" for a walker or a cane and that documentation is plainly absent from the administrative record. *See* 20 C.F.R. pt. 404, Subpt. P, app. 1 §§ 1.15, 1.16.

Plaintiff's testimony as to her inconsistent use of a cane and a walker further undercuts any purported error in the ALJ's analysis of whether Plaintiff fits under listing 1.15 or 1.16. She testified that in grocery stores, she does not use a cane or a walker because leaning on a stroller provides sufficient support. (AR at 53.) She also explained that she generally did not need a cane around the house except when she cooks. (*Id.* at 54.) These representations cast further doubt as to whether Plaintiff has a "medical need"—documented or otherwise—for a cane or other ambulatory assistive device. The ALJ did not err in his findings that Plaintiff did not qualify for listing 1.15 or 1.16.

      2.    <u>Neurological Listings</u>

With respect to neurological listings, Plaintiff first contends that the ALJ insufficiently analyzed whether her migraine headache met a listing at Section 11.00. (Pl. Br. at 17.) Plaintiff must explain how she "might have prevailed at step three if the ALJ's analysis had been more thorough." *Holloman*, 639 F. App'x at 814 (citing *Rutherford*, 399 F.3d at 553). It is undisputed that there is no listing for migraine headaches. (*See* Pl. Br. at 17 (acknowledging that "[t]here is no listing for migraine headaches")); *see also Marielena R. v. Dudek*, No. 24-1006, 2025 WL 834751, at *6 (E.D. Pa. Mar. 17, 2025) ("[T]here is no separate listing for primary headache disorders such as migraines."). The only specific listing that Plaintiff argues is implicated by her headache disorder is listing 11.02 for epilepsy. (Pl. Br. at 18.)

---

[11] Even a prescription on its own is not necessarily sufficient to demonstrate a cane is *medically necessary. See Howze v. Barnhart*, 53 F. App'x 218, 222 (3d Cir. 2002) (indicating that use of a cane throughout the record and prescription for same is still possibly "insufficient to support a finding that the [Plaintiff's] cane was medically necessary" (citing SSR 96–9p)).

The ALJ found that Plaintiff's severe seizure disorder did not meet the criteria for epilepsy under listing 11.02. (AR at 18.) For this listing, Plaintiff argues that the ALJ, "fail[ed] to consider all of plaintiff's severe impairments in combination or engage in any medical equivalence discussion." (Pl. Br. at 20.) According to Plaintiff, the ALJ's decision is devoid of "reference to the mandated combination of severe headaches disorder with severe seizure disorder" as prescribed by SSR 19-4p.[12] (*Id.*) Again, pointing to an ALJ's error in analysis is not enough to warrant remand on its own; that error *must* also be harmful. *See Woodson v. Comm'r Soc. Sec.*, 661 F. App'x 762, 766 (3d Cir. 2016) (remarking "error would be harmless" since Plaintiff "has not affirmatively pointed to specific evidence that demonstrates he should succeed at step three").

Listed Impairment 11.02 for epilepsy can be met through one of four criteria: Paragraph A, B, C, or D. The ALJ found that none of the four paths were sufficiently met under listing 11.02. (AR at 18.) Importantly, each one of the four paths to meet the 11.02 listing requires seizure symptoms at a certain frequency, *e.g.,* once a month for at least 3 consecutive months, and "adherence to prescribed treatment." *See* 20 C.F.R. pt. 404, Subpt. P, app. 1 § 11.02. Assuming *arguendo* that the Court were to credit Stacey's uncorroborated August 2023 hearing testimony that she experienced generalized tonic-clonic or grand mal seizures a few times per month, the record demonstrated that Plaintiff failed to consistently take her medication and failed to follow-up with a neurologist on a regular basis. (*See* AR at 21, 24; *see also id.* at 48, 50–51.) Accordingly, there is substantial evidence in the record to support Judge Costa's conclusion that Plaintiff could not meet the requirements of listing 11.02. Furthermore, Plaintiff cites no record evidence to support her claim that she meets the 11.02 listing; she merely denounces the ALJ's analysis. *See Williams v. Comm'r of Soc. Sec.*, No. 20-12254, 2022 WL 279838, at *7 (D.N.J. Jan. 31, 2022)

---

[12] SSR 19-4P provides guidance on how to evaluate primary headache disorders in disability claims. Social Security Ruling, SSR 19-4p; Titles II & XVI: Evaluating Cases Involving Primary Headache Disorders (S.S.A. Aug. 26, 2019).

("[Plaintiff's] failure to 'affirmatively point to specific evidence that demonstrates she would succeed at step three' is fatal to her appeal." (quoting *Woodson*, 661 F. App'x at 766)).

### 3.    Psychiatric Listings

Plaintiff contests the ALJ's findings that she did not meet the criteria of listings 12.04, 12.06, 12.11, and 12.15. (Pl. Br. at 18.) Three of the four potential psychiatric listings requires two of the following to be met: Paragraph A criteria, first and foremost, and then the criteria under either Paragraph B or Paragraph C. *See Cruz v. Comm'r of Soc. Sec.*, 244 F. App'x 475, 479 n.3 (3d Cir. 2007).[13] The focus of Plaintiff's argument is on Paragraph B.[14] (*See* Pl. Br. at 23–35.)

To satisfy Paragraph B, Plaintiff must show an extreme limitation in one of the following, or a marked limitation in two of the following areas of mental functioning: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself. *E.g.*, 20 C.F.R. pt. 404, Subpt. P, app. 1, § 12.04(B). ALJs are instructed to employ a five-point rating scale consisting of no limitation, mild limitation, moderate limitation, marked limitation and extreme limitation, to determine the appropriate limitation level.[15] "Marked is not defined by a specific number of different activities

---

[13] Paragraph A is unique as to each of the four listings; Paragraph B is the same as to all four listings; Paragraph C does not apply to listing 12.11 but is otherwise the same as to the remaining three listings. *See* 20 C.F.R. pt. 404, Subpt. P, app. 1, §§ 12.04, 12.06, 12.11, and 12.15.

[14] Plaintiff contends that paragraph A is implicitly met here as it is "rarely an issue" and is "deemed to have been satisfied" even when not discussed. (Pl. Br. at 22.) Plaintiff asserts that Paragraph A is purportedly "acknowledged in silence" but puts forth no authority supporting this proposition. (*See id.*) Thus, the Court cannot presume she satisfied Paragraph A as she proposes and thus failure to meet Paragraph A criteria is an independent ground to affirm the ALJ's decision with respect to all four 12.00 listings. Plaintiff also has not addressed the ALJ's finding that the "Paragraph C" criteria was not satisfied and thus any argument the criteria was met is waived.

[15] The five-point rating scale is further described in the regulations as the following: a. *No limitation (or none)*: You are able to function in this area independently, appropriately, effectively, and on a sustained basis; b. *Mild limitation*: Your functioning in this area independently, appropriately, effectively, and on a sustained basis is slightly limited; c. *Moderate limitation*: Your functioning in this area independently, appropriately, effectively, and on a sustained basis is fair; d. *Marked limitation*: Your functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited; and e. *Extreme limitation*: You are not able to function in this area independently, appropriately, effectively, and on a sustained basis. 20 C.F.R. pt. 404, Subpt. P, app. 1, § 12.00(F) (cleaned up).

of daily living in which functioning is impaired, but by the nature and overall degree of interference with function." *Leese v. Berryhill*, No. 17-1634, 2018 WL 4374230, at *9 (M.D. Pa. June 12, 2018) (citing 20 C.F.R. pt. 404, Subpt. P, app. 1, § 12.00C(1)), *report and recommendation adopted*, 2018 WL 4361596 (M.D. Pa. Sept. 13, 2018). In other words, there is no objective measure to distinguish a moderate limitation from a marked limitation.

In support of his conclusion that Plaintiff did not meet any psychiatric listing, the ALJ found that Plaintiff had a "moderate limitation" in each of the four areas of mental functioning in Paragraph B. (AR at 19.) Plaintiff contends that the ALJ should have characterized "at least two" of the Paragraph B criteria as marked limitations. (Pl. Br. at 34.) The Court reviews each of the four limitations in turn.

*First*, to "understanding, remembering, and applying information." The ALJ reasoned that Plaintiff was only moderately limited because she can drive a car, manage her personal finances, and read; and because she has been professionally assessed as having an "intact cognition." (AR at 19.) The ALJ made this determination while recognizing that Plaintiff also has memory deficits and challenges following directions. (*Id.*)

Plaintiff asserts that the ALJ focused on *non-work* abilities and limitations. (Pl. Br. at 25–26.) Plaintiff suggests that driving, reading, and paying bills are "transient activities" unrelated to work and thus "not pertinent" to the analysis on this point. (*Id.* at 25.)

As an initial matter, the Court is not persuaded that driving, reading and even managing personal finances are not work-like functions. *See, e.g., Jones v. Berryhill*, No. 17-882, 2019 WL 458942, at *8 (D. Del. Feb. 6, 2019) (crediting the ALJ's characterization of driving as a "work-like activit[y]"), *report and recommendation adopted*, 2019 WL 831111 (D. Del. Feb. 21, 2019). Moreover, Plaintiff's representation in her Function Report (*see* AR at 382), that she can pay bills,

handle savings, count change, and use a checkbook indicates that she, in an organized manner, can multitask and engage in forward-thinking math. *See, e.g., James R. v. Kijakazi*, No. 22-05030, 2023 WL 6389097, at \*8 (D.N.J. Sept. 30, 2023) ("[A]ctivities of daily life may be used by the ALJ as probative evidence of non-disability." (citing *Cunningham v. Comm'r of Soc. Sec.*, 507 F. App'x 111, 118 (3d Cir. 2012))).

Plaintiff also attempts to downplay her driving, reading, and personal financial management by citing to her testimony that she "tr[ies] not to drive a lot" other than for "emergencies." (*See* Pl. Br. at 25–26 n.8–10; AR at 71.) Further, in her November 11, 2019 Function Report (an SSA form that seeks information about, *inter alia*, an individual's daily activities, health conditions, and his or her ability to go to work), Stacey stated she drives but "not long distance[s]." (*Id.* at 382.) Plaintiff also answered "yes" when asked whether she can pay bills, handle a savings, count change, and use a checkbook. (*Id.*) While not cognitively impaired or "intellectually deficient," Plaintiff claims she was placed in special education classes. (Pl. Br. at 26 n.10 (citing AR at 72).)[16]

In essence, Plaintiff asks the Court to *re-weigh* the evidence. (Pl. Br. at 27.) In addition to attempting to minimize her driving, reading, and personal financial skills, she argues that the ALJ should have emphasized her alleged challenges in memory and following instructions. (*Id.*) But "it is not the Court's role to re-weigh the evidence, either against or in favor of the plaintiff, or to 'impose its own factual determinations.'" *Lori C. v. Comm'r of Soc. Sec. Admin.*, No. 23-4369, 2024 WL 4803787, at \*7 (D.N.J. Nov. 15, 2024) (quoting *Chandler*, 667 F.3d at 359). The Court finds that the record evidence as a whole and particularly the evidence of her driving, reading, and managing her personal finances substantially supports the ALJ's finding of a moderate limitation

---

[16] As discussed *supra*, this is contradicted by the representations in Stacey's Disability Report (Form SSA-3368), which indicates Plaintiff did not attend special education classes. (AR at 361.)

of "understanding, remembering, or applying information" at Step Three. *See Hernandez v. Comm'r of Soc. Sec.*, 89 F. App'x 771, 773–74 (3d Cir. 2004) (recognizing the ALJ "need not undertake an exhaustive discussion of all the evidence" (citing *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000))).

*Second*, on "interacting with others," Plaintiff again contends that the ALJ did not appropriately contemplate her "workplace abilities." (Pl. Br. at 28.) She takes issue with the ALJ's consideration of her ability to socialize with friends on the phone, her ability to go shopping with her boyfriend, and the characterizations of mental health professionals that she was "pleasant and cooperative." (*Id.*) Plaintiff believes Judge Costa's decision understates her difficulty in cooperating with others and being in large crowds, and her short fuse. (*Id.* (citing AR at 19).) She argues these traits make her susceptible to problems in the workplace. (*Id.* at 28–29.) Once again, the Court cannot re-weigh the evidence even if the Court, faced with the same evidence, *might* have decided differently. Plaintiff provides no support for her statement that "it is obvious" this is a marked limitation. (*Id.* at 29.)

*Third*, the ALJ again considered the record evidence indicating Plaintiff can drive, read, and handle her personal finances when determining the appropriate limitation for "concentrating, persisting or maintaining pace." (AR at 19.) And again, Plaintiff contends these should not have been considered by Judge Costa. (Pl. Br. at 30.) She also claims that the ALJ downplayed her attention and concentration deficiencies (*Id.* at 30–31 (citing AR at 19).) Not only did the ALJ consider Stacey's driving, reading, and financial management ability, but he also considered her own representations as to her deficits in attention and concentration, as well as her treating mental health providers' assessment of her having fair (rather than poor) concentration and focus. (AR at 19 (citing *id.* at 461, 464, 467, 469, 473, 475, 477, 479, 486, 489, 494, 498, 502, 506, 510).) In

fact, in November 2019, her mental health provider noted her improved concentration and focus, and changed his assessment of them from "fair" to "good." (*Id.* at 514.)

Without citation to the record, Plaintiff contends that she was often described as having "poor" attention. (Pl. Br. at 31.) She also argues the decision was deficient by not considering or mentioning her severe headaches, severe seizure episodes, severe attention deficit disorder, and intrusive thoughts. (*Id.*) The ALJ is not required to "cite all evidence . . . present[ed]" by Plaintiff. *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 204 (3d Cir. 2008). Instead, the ALJ's determination was supported by substantial evidence, including multiple records from mental health providers.

*Fourth*, Judge Costa found that Stacey had a moderate limitation in "adapting and managing oneself." (AR at 19.) In coming to his conclusion, the ALJ acknowledged that Plaintiff reported suffering panic attacks, having difficulties with stress management, and having difficulties with dealing with change. (*Id.* (citing *id.* at 385, 519–20).) However, he emphasized Plaintiff's "conservative" mental health treatment, largely consisting of "medication management"; and notations by medical personnel regarding her "fair" grooming, insight, and judgment; and her adequate hygiene. (*Id.*) Plaintiff argues that the ALJ did not consider her ability to regulate her emotions, control her behavior, maintain mental wellbeing, and respond to demands. (Pl. Br. at 33–34.) Once again, the ALJ properly considered Plaintiff's abilities and challenges and need not mention every possible consideration. (*see* AR at 19); *see Beety-Monticelli v. Comm'r of Soc. Sec.*, 343 F. App'x 743, 747 (3d Cir. 2009) (recognizing that an ALJ "need not mention every piece of evidence in the record"). The ALJ did not err in finding Plaintiff was moderately limited in "adapting and managing oneself."

Because Judge Costa's determination that Plaintiff had a moderate limitation in each of the

27

four Paragraph B criteria was supported by substantial evidence, he did not err in concluding that Stacey did not satisfy listings 12.04, 12.06, 12.11, or 12.15.

### C.   STEP FOUR

#### 1.   The RFC's five limitations

Next, Plaintiff asserts that the five functional limitations in the RFC are without support. (*See* Pl. Br. at 43.) "Residual functional capacity is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Fargnoli*, 247 F.3d at 40 (citing *Burnett*, 220 F.3d at 121). An ALJ's RFC must "be accompanied by a clear and satisfactory explication of the basis on which it rests." *Id.* at 41. A reviewing court "examine[s] the ALJ's conclusions as to a claimant's RFC with 'the deference required of the substantial evidence standard of review.'" *Martin v. Comm'r of Soc. Sec.*, 547 F. App'x 153, 160 (3d Cir. 2013) (quoting *Burns v. Barnhart*, 312 F.3d 113, 129 (3d Cir. 2002)) (citing 20 C.F.R. § 404.1545). The Court reviews each RFC limitation in turn.

##### a)   *Off Task 10% of the Workday*

Plaintiff first takes issue with the ALJ's determination that she would be off task approximately 10 percent of the workday. (Pl. Br. at 44 (citing AR at 20).) Plaintiff describes the selection of 10% as having "no rationale" and as being picked "out of the sky." (*Id.* at 43.)

While it is true that the 10% may not be calculated using a sophisticated formula, it does not mean the ALJ erred in determining a 10% off-task limitation was appropriate. In fact, the record supports such a finding in the RFC determination, which followed the "consider[ation] [of] all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." (AR at 20.)

Similarly, the plaintiff in *Fayyadh v. O'Malley*, took issue with the ALJ's determination that the plaintiff would be off task for 10% of the workday. No. 23-4707, 2024 WL 3027471, at

\*4 (E.D. Pa. June 17, 2024). But neither Stacey nor the plaintiff in *Fayyadh* "pointed to any evidence which specifically indicate[d] that [s]he would be off task more than 10% of the workday." *Id.* Instead, "[s]he simply argue[d] that the extent of his physical and mental impairments 'could result in an even greater off-task limitation.'" *See id.* Stacey points to her migraine headaches, seizure disorder, anxiety disorder, PTSD, depression and attention deficit disorder as conditions indicating that she may be off task *more* than 10% of the workday. (Pl. Br. at 44); *see Fayyadh*, 2024 WL 3027471, at \*5 ("In the absence of evidence specifying that [plaintiff] would be off task more than 10% of the day, it is impossible to agree with him that the absence of a scientific, reproducible, method for arriving at that specific number is grounds for remand." (internal quotation marks omitted)).

Here, the ALJ specifically noted and considered objective medical evidence relating to her seizures, migraines, and other neurological impairments. (*See* AR at 21–22.) Importantly, the ALJ found that Plaintiff's representations as to the intensity, persistence, and limiting effects of the symptoms were not supported by the record. (*Id.* at 23.) Moreover, Plaintiff alleged that she suffered "debilitating mental impairments," the ALJ noted that the record only reflected "conservative treatment, with no acute exacerbations necessitating more restrictive treatment" and no mental health treatment "since at least May 2021." (*Id.* at 24.) Given the ALJ's decision and the record supporting it, "Plaintiff has not mustered the evidence to show that these limitations would result in Plaintiff's being off-task more than 10% of the workday." *See Burke v. Comm'r of Soc. Sec.*, No. 19-14148, 2020 WL 2989081, at \*3 (D.N.J. June 4, 2020). Thus, there is no basis to disturb the ALJ's decision here.

### b)    *Occasional Contact with Superiors and Coworkers*

Plaintiff argues that the ALJ's finding that Plaintiff "can have occasional contact with supervisors and coworkers but no direct contact with the general public" is without "rationale or

evidence." (Pl. Br. at 42, 46 (citing AR at 20).) The Court disagrees.

Substantial evidence supports the ALJ's finding that Plaintiff can have occasional contact with supervisors and coworkers. As already discussed *supra*, the ALJ determined that Plaintiff has a moderate limitation in interacting with others. (*See* AR at 19.) The record indicates that Plaintiff socialized with friends on the phone "everyday" and shopped in stores multiple hours a week. (*Id.* at 382–83.) She was also observed to be pleasant and cooperative during her psychological examinations. (*Id.* at 520.) Finding that she cannot have contact with the general public sufficiently accounts for her reports of anxiety and panic attacks that are purportedly caused by crowds. (*Id.* at 19, 382.) The ALJ's conclusion that Plaintiff is unable to interact with the public but can have "occasional contact" with supervisors and co-workers is thus a measured decision supported by substantial evidence in the record. *See Jacklyn C. v. Comm'r of Soc. Sec.*, No. 20-01256, 2022 WL 17977059, at *8 (D.N.J. Dec. 28, 2022) ("[W]hile Plaintiff has identified some evidence that might permit a court to resolve the RFC factual inquiry slightly differently, this does not satisfy Plaintiff's burden on appeal." (citing *Nalej v. Berryhill*, No. 16-3079, 2017 WL 6493144, at *9 (D.N.J. Dec. 19, 2017))).

### c)    *Cane for More than 50 Feet or Uneven Terrain*

While Plaintiff acknowledges that she needs a cane, she argues that the ALJ did not explain how he concluded that the cane was only necessary to walk 50 feet or on uneven terrain. (Pl. Br. at 46–48.) Judge Costa explained that "in an abundance of caution, and giving [Plaintiff] the benefit of the doubt," he included a qualified use of a cane in the RFC. (AR at 23.) While the record indicates Plaintiff used a walker or cane at times, they were not always needed. For example, Plaintiff testified that she uses alternative methods to ambulate, such as leaning on a baby stroller. (*See id.* at 21, 53.) Further, Plaintiff testified that she does not always use a cane around the house but does use it when going out. (*See id.* at 54.) Therefore, substantial evidence in the

record supports *some* cane usage but not all the time, which is exactly what the cane limitation in the RFC accounts for. The qualifiers on the cane use—ambulating for more than 50 feet or on uneven terrain—are not erroneous given the record. It is not necessary for the ALJ to explain specifically how or why 50 feet, as compared to 25 or 75 feet, was selected. *See, e.g., Paul H. v. Comm'r of Soc. Sec.*, No. 24-5970, 2025 WL 1348534, at *7 (D.N.J. May 8, 2025) (citing *Wennersten v. Colvin*, No. 12-783, 2013 WL 4821474, at *3 (W.D. Wis. Sept. 10, 2013)).

### d)    Sedentary Work

Next, Plaintiff argues that the ALJ's finding that Stacey can perform sedentary work did not contain the necessary "evidentiary functional analysis" as required by the Commissioner's mandate at SSR 96-8p.[17] (Pl. Br. at 48.)

Sedentary work "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. § 404.1567(a). While these types of jobs largely involve sitting, jobs that "require[] occasional[]" walking and standing can still qualify. *Id.*

The ALJ's decision included a substantive discussion of the evidence including crediting evidence of Plaintiff's lumbar spine ailments and her subjective testimony of "pain and reduced physical functioning." (*See* AR at 25.) Importantly, the sedentary classification is to Plaintiff's benefit as it is the least physical of the five exertional levels. *See Jones v. Astrue*, No. 10-3226, 2011 WL 4478489, at *9 (D.N.J. Sept. 26, 2011) (citing 20 C.F.R. § 404.1567(a)). Plaintiff's brief is devoid of any arguments that she cannot perform *even* sedentary work nor does the record otherwise bear this out.

---

[17] SSR 96-8p covers the SSA's policies regarding the assessment of RFC in claims for disability benefits. Social Security Ruling, SSR 96-8p, Titles II & XVI: Assessing Residual Functional Capacity in Initial Claims, (S.S.A. July 2, 1996).

       e)      *Able to Understand, Remember, and Carry Out Simple Instructions*
                *with Only Occasional Changes to Essential Job Functions*

Plaintiff also argues that the ALJ's finding that she is "able to understand, remember, and carry out simple instructions with only occasional changes to essential job functions" is lay speculation and is belied by Plaintiff's treating mental health professionals and the Commissioner's veteran psychological examiner, Dr. Brown. (Pl. Br. at 50–51.) She claims that those same professionals found Plaintiff had "poor to no abilities in following instructions, interacting with others and maintaining attention and concentration." (*Id.* at 50.)

Plaintiff argues that (1) her "treating mental health professionals . . . find plaintiff to suffer marked limitations and/or poor to no abilities in following instructions, interacting with others and maintaining attention and concentration" and (2) that the ALJ rejected the findings of her treating mental health professionals. (*Id.* at 50 (citing AR at 458–89, 492–517).) Neither assertion is accurate. *First*, as already recounted *supra*, notes from her treating mental health professionals regularly indicated that her "[t]hought process [was] clear and logical," her focus was "fair," and her cognition "intact." (*See, e.g.,* AR at 477, 479, 486, 498.) *Second*, the ALJ explicitly relied on the records of her treating mental health professionals in rendering his decision. (*See, e.g., id.* at 24 ("[C]onsidering . . . the conservative nature of the [Plaintiff's] outpatient mental health treatment."); at 26 ("[T]he record also reflects conservative treatment, with no acute exacerbations necessitating more restrictive treatment, and her longitudinal mental status examinations did not reflect any markedly positive findings.").

The ALJ had found prior administrative medical findings by Dr. Naplin and Dr. Wieliczko to be unpersuasive. (*Id.* at 24.) This is of no negative consequence to Plaintiff as these two doctors opined that Stacey had *no* severe mental impairments and *no* limitations. (*Id.*) Dr. Brown, the mental health consultative examiner, on the other hand, found Plaintiff to have marked limitations

in complex instructions and interacting with the public. (*Id.* (citing *id.* at 522).) The ALJ found his opinion to be unpersuasive because it was not consistent with Plaintiff's conservative outpatient treatment and longitudinal mental status examinations. (*Id.*) In any event, the RFC already accounted for what Dr. Brown describes as marked limitations because Stacey is limited to "simple instructions" and only to contact with supervisors and co-workers (not to the general public). (*Id.* at 20.) The ALJ also gave no weight to the mental source statement, an SSA form, whereby Ms. McBratney assessed Stacey's "ability to do work related activities on a day to day basis in a regular work setting." (*Id.*; *id.* at 532.) Consistent with the form's instructions to assess "how [Stacey's] physical capabilities are affected by [her] impairment(s)," Ms. McBratney found Plaintiff to have poor to no abilities in interaction and adaption, complex instructions, and maintaining attention and concentration. (*Id.* at 24.) Judge Costa determined that her evaluation of Stacey was inconsistent with the Plaintiff's treatment records and the record as a whole. (*Id.* at 25.) Again, notwithstanding the ALJ's finding that Ms. McBratney's opinions were unpersuasive, they are in essence captured in the RFC. Even Ms. McBratney acknowledged that Plaintiff would be "fair" in interacting with supervisors and relating to co-workers as compared to "poor" in dealing with the public. (*Id.* at 532.) She also assessed that Plaintiff would be "fair" in handling simple job instructions. (*Id.* at 533.)

In all, the ALJ properly assessed and considered the medical opinions in the record. *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (recognizing that while an ALJ is required to address such medical opinions, there is no requirement that the opinion be adopted). While Plaintiff describes the ALJ's conclusions as resting on "lay speculation," (Pl. Br. at 50), Judge Costa makes clear that his conclusions are based on the multitude of mental health treatment records reflecting conservative treatment. (AR at 24, 25); *Sutherland v. Comm'r Soc. Sec.*, 785 F.

App'x 921, 928 (3d Cir. 2019) (reasoning "the ALJ here did not speculate" where he "relied upon evidence in the record to conclude that [plaintiff] is not disabled"). It is precisely the ALJ's function to make the final determination as to the RFC and relying on Stacey's longitudinal mental health treatment to formulate the RFC is consistent with his mandate. *See Garrett v. Comm'r of Soc. Sec.*, 274 F. App'x 159, 163 (3d Cir. 2008) ("The determination of the claimant's RFC is the exclusive responsibility of the ALJ." (citing 20 C.F.R. §§ 404.1527(e)(2), 404.1546)); *see also Hess*, 931 F.3d at 214 (finding that the ALJ's RFC determination at step four was "sufficient" where the ALJ "highlighted, among other things, the following: mental status examinations and reports . . .").

### 2.    Consideration of Plaintiff's Obesity in RFC Rationale

Plaintiff again takes issue with how the ALJ considered her obesity, this time contending that the ALJ's "decision hardly considers obesity in any articulated form in its RFC rationale." (Pl. Br. at 48–50.) While the ALJ did not explicitly discuss the impact of Plaintiff's obesity at Step Four, he need not have as he previously confirmed that he had considered the effect of Plaintiff's obesity "singularly [and] in combination with her other medical impairments." (AR at 17.) In doing so, he found that Plaintiff's obesity had no more than a minimal effect on her ability to work and thus no significant work-related limitations of function. (*Id.*) At Step Four, the ALJ explained that he formulated the RFC after carefully considering the *entire record* and *all* of Plaintiff's symptoms. (*See id.* at 20.) The Court finds this to be sufficient consideration of Plaintiff's obesity impairment as required when formulating an RFC. *See* 20 C.F.R. § 404.1545(a)(2). Thus, in viewing the record as a whole, the ALJ properly considered Plaintiff's obesity throughout his analysis. *See Zirnsak*, 777 F.3d at 610 (instructing reviewing courts to look at the "record as a whole").

Moreover, as determined previously herein on repeated occasions, she has not met her

burden to explain how its omission was harmful. In other words, Plaintiff has not explained how the RFC would have turned out differently for her. Just as in *Alejandra D. v. Commissioner of Social Security*, "Plaintiff has not pointed to any evidence in the record indicating . . . that she required additional RFC limitations due to her obesity." No. 22-175, 2023 WL 2609134, at *10 (D.N.J. Mar. 22, 2023). "Generalized" arguments that obesity would affect her spinal impairments are not sufficient. *See Cosme v. Comm'r of Soc. Sec.*, 845 F. App'x 128, 132 (3d Cir. 2021); *see also Carter v. Comm'r of Soc. Sec.*, 805 F. App'x 140, 143 (3d Cir. 2020) (a plaintiff must establish not just that "obesity *can* impair one's ability to perform basic work activities," but must also "specify[ ] how *her* obesity . . . affected her ability to perform basic work activities" (emphasis added)). Plaintiff has failed to meet her burden to show harmful error.

## CONCLUSION

Having reviewed the record as a whole, the Commissioner's decision is **AFFIRMED**. An appropriate Order follows.

ROBERT KIRSCH
UNITED STATES DISTRICT JUDGE

Dated: July 31, 2025